**Rolando CORONADO, Petitioner,**

v.

**Eugene S. LEFEVRE, Superintendent, Clinton Correctional Facility, Dannemora, New York and Robert Abrams, Attorney General of the State of New York, Respondents.**

**No. 87 Civ. 2539 (RJW).**

United States District Court, S.D. New York.

Oct. 1, 1990.

Rolando Coronado, pro se.

Robert T. Johnson, Dist. Atty. of Bronx. County, Bronx, N.Y. (Allen H. Saperstein, of counsel), for respondents.

## OPINION

ROBERT J. WARD, District Judge.

Rolando Coronado petitions this Court *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. By order dated April 16, 1987, the petition was referred to the Honorable Joel J. Tyler, United States Magistrate, to hear and report pursuant to 28 U.S.C. § 636(b)(1) and Rule 4 of the Local Rules for Proceedings Before Magistrates. On September 7, 1989, Magistrate Tyler filed a Report and Recommendation (the "Report") in which he recommended that the writ be denied and the petition dismissed. Petitioner filed timely objections to the Report on May 17, 1990.[1] Having reviewed the Report and considered *de novo* those portions to which petitioner has objected, the Court hereby adopts the magistrate's recommendations, denies petitioner's writ of habeas corpus, and dismisses the petition.

## BACKGROUND

Petitioner was convicted, on January 18, 1985, after a two-week bench trial in the Supreme Court of the State of New York, Bronx County, of Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Fourth Degree (New York Penal Law, §§ 125.25(1) and 265.01) in connection with the death of Sonia Gutierrez ("Gutierrez"), a 13–year old student at Junior High School 52 ("JHS 52") in Manhattan. Gutierrez was found murdered on April 16, 1983, on Boone Avenue in the Bronx. Wrapped around her body was a metallic gold-colored belt.

The evidence implicating petitioner in the murder of Gutierrez originated in part from an assault on Roberto Perez ("Perez") on May 21, 1983. According to Perez, a 17–year old student attending JHS 52, on that night petitioner approached him from behind, put a knife to his back and demanded his wallet. Although Perez offered his wallet to petitioner, Perez testified that petitioner refused to take it. Petitioner instead placed a blindfold on Perez's face, and forced him to walk for "hours" through the streets of the Upper West Side of Manhattan. Before leading Perez into Riverside Park ("the park"), petitioner kicked and hit Perez in an alley, and told him that it was "just a shame that its got to happen again."

Later, while in the park, petitioner asked Perez what school he attended. Perez stated that he went to JHS 52. Petitioner, who had graduated from JHS 52 in 1979, asked Perez if he knew a boy named Danny. Perez told him that he did. Petitioner and Perez then had a conversation regarding Danny, whereupon petitioner inquired whether "anything interesting had happened in the school recently?" Perez responded that a girl had been killed. Ac-

---

1. The Court granted petitioner extensions of time in which to file his objections to the Report.

cording to Perez, petitioner then stated: "I want you to know I killed her and if you don't shut up, I'm going to have to kill you too."

Sometime after this conversation, Perez tried to escape. Petitioner grabbed him, stabbed him in the back several times, and left him for dead in the park, discarding the knife in nearby bushes. Perez regained consciousness at Mt. Sinai Hospital ("Mt. Sinai") the following day. There he was examined by a psychiatrist who concluded that Perez was suffering from visual and auditory hallucinations and recommended that he be subjected to further psychiatric evaluation.[2]

Also on May 22, the day after the stabbing, petitioner went to the 20th Precinct to confess to the murder of Perez, believing that he had killed him the night before in the park. The police attempted to confirm the story. However, since no murder had been reported in the park, petitioner was released.

After Perez spoke with the police and confirmed an attack in the park, petitioner was arrested by Detectives Robert Subach ("Subach") and Carlos Rivera ("Rivera") and taken into custody.

At the police station, Subach and Rivera brought petitioner to an interrogation room. Petitioner was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), whereupon he told Subach and Rivera that he understood his rights and that he wished to speak to them. Subach and Rivera told petitioner that he was being arrested for the stabbing of Perez and that he was under investigation for the murder of Gutierrez. The interrogation lasted approximately nine hours, from 3:00 or 3:30 P.M. on May 31, 1983, to 1:00 or 1:30 A.M. on June 1, 1983, and ended with a videotaped statement by petitioner in the presence of Assistant District Attorneys from both New York and Bronx Counties.

During the interrogation, petitioner made several statements. He confessed to the Perez stabbing, and also to two murders, which police could not confirm. He repeatedly told the detectives that he liked to watch people suffer and enjoyed terrifying others. He stated that he used drugs on a daily basis.[3] Although petitioner continually denied any involvement in, or knowledge of, the murder of Gutierrez, he asked the detectives "how he could drive and hold her [Gutierrez] at the same time," even though the detectives did not tell petitioner that Gutierrez's body had been transported by car to the Bronx. Additionally, when petitioner saw a picture of the deceased he stated, "good-bye Sonia, I guess its all over."[4] Petitioner also suggested that he did not mind telling the police about Perez since they already knew about him, but that they would have to "figure out" what happened to Gutierrez, since they knew nothing about her.

Petitioner pled guilty to charges relating to the assault on Perez, and was sentenced to a term of 8 to 16 years. He was later indicted by a Bronx grand jury for Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Fourth Degree (one count was later dropped), in relation to the Gutierrez murder.

Prior to trial for the Gutierrez murder, a suppression hearing was held before the trial judge, the Honorable Elbert Hinkson. The prosecution sought the admission of all of petitioner's statements to the detectives,

---

2. The psychiatrist based her evaluation on statements made to the doctors at Mt. Sinai. For example, Perez told the doctors that he saw a Hispanic male everywhere he went for four days prior to his admittance into the hospital; that he had discussions about a boy named Danny with this Hispanic male; and that he had been hearing the voice of a female cousin calling his name. At trial, the doctor conceded that her conclusion might be called into question by the fact that Perez had, indeed, been attacked by a hispanic male several days earlier.

3. Petitioner told the detectives that he ingested five pills of mescaline every day, including the day he was arrested and interrogated.

4. Petitioner knew that the name of the deceased was Sonia Gutierrez prior to this statement. The detectives told petitioner her name during the interrogation.

a videotape of the crime scene showing the body of Gutierrez, and the identification of petitioner by Perez and all of petitioner's statements to Perez. Petitioner moved for suppression of the statements he made to the detectives on the ground that they were not made voluntarily; of Perez's testimony and identification on the grounds that Perez was mentally unstable [5] and the identification procedure unduly suggestive; and the videotape of the crime scene due to its highly prejudicial nature and low probative value.

The detectives testified at the hearing that petitioner was always responsive to their questions during the interrogation session, and that he was generally calm. However, they also stated that petitioner seemed to have "severe psychiatric problems," that he seemed to be "missing a few parts" and that he was "crazy as a bedbug." They stated that there were breaks during the interrogation while petitioner ate dinner, used the bathroom, and watched some television.

Judge Hinkson's ruling on these issues included findings of fact and conclusions of law. He suppressed much of the evidence that was proffered by the prosecution during the course of the hearing,[6] primarily on the ground that its probative value was outweighed by the extreme prejudice that it would cause to the defendant. With respect to the statements made by petitioner to the detectives, the judge found that "the record clearly established that the defendant was fully aware of the statements he was making [to the detectives];" that "he responded to questions in a clear and rational manner," and that "there is no definitive indication of mental disease attributable to the defendant." Judge Hinkson determined that although petitioner was interrogated for nine hours, he was not questioned continuously, for he was

fed, went to the bathroom, and watched television for a period of time.

Regarding Perez, the Judge found that he had been hospitalized for physical, and not mental reasons, and that although Perez had hallucinations and his recitation of events were "bizarre," this was "clearly understandable considering the traumatic ordeal he had just experienced." The judge concluded that Perez's "recounting of the ordeal ... [was] at a minimum substantially factual."

After Judge Hinkson announced his decision, petitioner asked that his attorney be relieved since he was urging petitioner to plead guilty on all counts. The Court reserved decision, but later denied the application. Petitioner then requested a non-jury trial, over the vociferous objections of his counsel. The Court again reserved decision, and told petitioner to "discuss the matter very thoroughly with [his] attorney and give it a great deal of thought overnight." The following day, Judge Hinkson warned petitioner of the risks of a non-jury trial. He explained to petitioner the possible prejudice that could occur against him. However, petitioner insisted on waiving his right to a jury trial.

Petitioner's attorney then requested that a competency hearing be held to determine petitioner's mental state.[7] The hearing was held before Judge Hinkson on January 3 and 4, 1985. At the hearing, the prosecution called as witnesses two psychiatrists who had examined petitioner several weeks earlier to evaluate his competency to stand trial. Both testified that it was their opinion that petitioner was competent to stand trial, since he had the ability to assist in his defense and to understand the charges against him. Petitioner did not present any evidence as to his competency at the hearing.

---

**5.** Here petitioner is referring to the diagnosis of Perez at Mt. Sinai on May 22.

**6.** Judge Hinkson suppressed the entire videotape of the crime scene; the details of petitioner's attack on Perez (except the fact that the attack occurred and the conversations and admissions made by petitioner to Perez); the portions of petitioner's confessions to the detectives

dealing with his fascinations with death and violence; his sexual orientation; and those statements referring to other unrelated crimes.

**7.** The competency hearing followed a prior examination of petitioner by two psychiatrists on December 18, 1984.

Following the testimony of the witnesses and argument of counsel, Judge Hinkson concluded that petitioner was competent to stand trial and assist in his own defense. He also determined that petitioner had the capacity to understand the consequences of waiving his right to a jury trial, and that there was no evidence of any mental disease. At the close of the hearing, Judge Hinkson again asked petitioner if he wished to waive his right to a jury trial. Petitioner stated that he did. During a colloquy with the court, petitioner said that he understood the effects of his decision, but still wished to waive his right to a jury trial. Judge Hinkson found that petitioner understood what he was doing, and granted petitioner's application. Petitioner then signed a written waiver.

The case was tried before Judge Hinkson. A number of witnesses were called by both the prosecution and the defense.[8] The first significant witness called by the prosecution was Subach. His direct testimony related to the investigation and subsequent interrogation of petitioner. He testified to petitioner's admissions concerning his attack on Perez and to petitioner's statements that linked him to the Gutierrez homicide.[9]

Next to testify was Perez. Perez first recounted the events that occurred the night of May 21, 1983, when petitioner assaulted him in the park, as circumscribed by Judge Hinkson's rulings at the suppression hearing. Perez testified that after they had discussed the murder at JHS 52, petitioner told him that "it was a shame that it had to happen again," and that "I just want you to know that I killed her, and if you don't shut up I'm going to have to kill you too."

The prosecution also called Abigail Alvarez ("Alvarez"), a friend of Gutierrez from JHS 52. Alvarez testified that she had seen Gutierrez with petitioner a few times; that the two had a relationship which was symbolized by the wearing of each other's clothes or jewelry (in this case the gold belt); and that just before Gutierrez was killed, she and petitioner had argued over the fact that her parents would not let her go out on dates.

The defense called Gutierrez's sister as a witness. She testified that although she and Gutierrez had shared a room and did all of their shopping together, she had never seen the gold belt prior to Gutierrez's death. She also testified that while Gutierrez said that a "big boy" was in "love with her," Gutierrez had never mentioned petitioner's name. Additionally, she testified that she had never seen either Alvarez or petitioner previous to that day in court.

Gutierrez's step-mother also testified for the defense. Like Gutierrez's sister, she stated that she had never seen the gold belt, and that Gutierrez had stated before she was killed that an older boy was in love with her. The witness also testified that Gutierrez never asked her if she could go out on a date. In addition, the court reporter who had taken down the grand jury proceedings testified that during the grand jury proceedings Perez had testified that petitioner asked him if he knew a girl named "Dinah" at JHS 52, and not about a girl "dying," and the psychiatrist who had examined Perez following the stabbing testified as to her evaluation of Perez' mental condition at that time.

After hearing closing arguments, the court reserved decision. When it rendered its verdict four days later, the court concluded that "after along [sic] and due deliberation" petitioner is "guilty in the first count of the indictment, the crime of Murder in the Second Degree; under the second count of the indictment the defendant is found guilty of the crime of Criminal Possession of a Weapon in the Fourth Degree." Petitioner was sentenced on February 13, 1985, by Judge Hinkson, to concurrent sentences of 25 years to life, and one year, to be served consecutively to the 8 to 16 year sentence petitioner received for the assault on Perez.

8. The prosecution called seven witnesses and introduced twelve exhibits, while the defense presented four witnesses and five exhibits.

9. For example, "how could he drive and hold her at the same time" and that the police should "figure out" what happened to Gutierrez.

On appeal to the Appellate Division, First Department, petitioner argued that he did not voluntarily, knowingly and intelligently waive his *Miranda* rights prior to interrogation; that he did not knowingly and intelligently waive his right to a jury trial; that the evidence presented at the trial was insufficient to prove guilt beyond a reasonable doubt; and that the sentence imposed was excessive. The Appellate Division, First Department unanimously affirmed petitioner's conviction without opinion. *People v. Coronado,* 502 N.Y.S.2d 315, 120 A.D.2d 993 (1986). Leave to appeal to the New York Court of Appeals was denied. *People v. Coronado,* 506 N.Y.S.2d 1043, 497 N.E.2d 713, 68 N.Y.2d 756 (1986).

After thus exhausting his available state remedies, petitioner brought the instant petition asserting three grounds for relief, as follows:

1) that he did not knowingly, intelligently and voluntarily waive his *Miranda* rights prior to police interrogation;

2) that he did not knowingly and intelligently waive his right to a jury trial; and

3) that his guilt was not established beyond a reasonable doubt due to the weak and equivocal evidence adduced at trial.

## DISCUSSION

■ To accept the report and recommendation of a magistrate to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record. *See* Rule 72, Fed.R.Civ.P., Notes of Advisory Committee on Rules (citing *Campbell v. United States District Court,* 501 F.2d 196, 206 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974)). 28 U.S.C. § 636(b)(1) affords the district court broad latitude in considering a magistrate's recommendation, even if no party objects to it. *Grassia v. Scully,* 892 F.2d 16, 19 (2nd Cir.1989). However, when timely objection has been made to a portion or portions of a magistrate's report, the district judge must "make a *de novo* determination ... of any portion of the magistrate's disposition to which specific written objection has been made." Rule 72(b), Fed.

R.Civ.P.; *See also* 28 U.S.C. 636(b)(1). The judge may then accept, reject, or modify, in whole or in part, the magistrate's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

■ A district court's obligation to make a *de novo* determination of properly contested portions of a magistrate's report does not require that the judge conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980). It is sufficient that the district court "arrive at its own, independent conclusion about those portions of the magistrate's report to which objection is made." *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983). To this end, the court must "exercise ... sound judicial discretion with respect to whether reliance should be placed on [the magistrate's] findings." *American Express Int'l Banking Corp. v. Sabet,* 512 F.Supp. 472, 473 (S.D.N.Y.1981), *aff'd without opinion,* 697 F.2d 287 (2nd Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982).

In the instant case, petitioner filed timely objections to the magistrate's Report. The Court has reviewed *de novo* those portions of the Report to which petitioner has objected. Petitioner, in his objections, has failed to raise any argument that would justify granting the petition. Thus, the Court hereby adopts the magistrate's recommendations.

### 1. *Waiver of Miranda rights*

■ Petitioner's first ground for relief is that he did not voluntarily, knowingly and intelligently waive his *Miranda* rights prior to police interrogation. Petitioner claims that he was suffering from mental illness at the time he was interrogated. He relies on certain statements made by the detectives at the suppression hearing, such as "he's [petitioner] missing a few parts" and "he [petitioner] was crazy as a bedbug." Petitioner also asserts that just before he was interrogated, he swallowed five pills of mescaline. He claims that due to his illness and ingestion of drugs, he

was impaired, and thus could not have waived his *Miranda* rights voluntarily, knowingly and intelligently.

▮▮▮ Under 28 U.S.C. § 2254(d), state court findings of fact are given a presumption of correctness in a federal habeas corpus proceeding unless one of eight enumerated exceptions applies. 28 U.S.C. § 2254(d).[10] The presumption of correctness applies to factual determinations made either by a state trial court or an appellate court. *Sumner v. Mata,* 449 U.S. 539, 544–47, 101 S.Ct. 764, 767–69, 66 L.Ed.2d 722 (1981). Although a federal court is required to presume a state court's finding of fact to be correct, it is also required to conduct an independent review of any conclusions of law. *See Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Wainwright v. Witt,* 469 U.S. 412, 429–30, 105 S.Ct. 844, 854–55, 83 L.Ed.2d 841 (1985).

▮▮▮ It has been noted that it is not always readily apparent whether the resolution of a particular issue turns on a question of fact or one of law. *Miller v. Fenton, supra,* 474 U.S. at 113, 106 S.Ct. at 451. Although Courts of Appeals in other circuits have disagreed as to whether the determination that a waiver was made voluntarily, knowingly and intelligently is a factual or legal inquiry, *compare Bryan v. Warden,* 820 F.2d 217, 219 (7th Cir.1987), *cert. denied,* 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987) (voluntariness of a waiver of *Miranda* rights is a question of fact entitled to a presumption of correctness) with *Ahmad v. Redman,* 782 F.2d 409, 413 (3d Cir.1986), *cert. denied,* 479 U.S. 831, 107 S.Ct. 119, 93 L.Ed.2d 66 (voluntariness of waiver is a mixed question of fact and law subject to independent review by federal habeas courts), in this circuit it has been held that a state court's finding that a waiver was voluntary, knowing and intelligent is a legal inquiry subject to *de novo* review. *Toste v. Lopes,* 861 F.2d 782, 783 (2d Cir.1988), *cert. denied sub nom. Toste v. Meachum,* — U.S. —, 109 S.Ct. 3170, 104 L.Ed.2d 1032 (1989) ("[t]he validity of a waiver is a matter for independent federal determination") (quoting *Brewer v. Williams,* 430 U.S. 387, 403–04, 97 S.Ct. 1232, 1241–42, 51 L.Ed.2d 424 (1977)). *See also Miller v. Fenton, supra,* 474 U.S. at 113, 106 S.Ct. at 451 (voluntariness of confession a matter for independent federal review). Nonetheless, subsidiary factual conclusions of a state court must be given a presumption of correctness by a federal court on habeas corpus review. *Miller v. Fenton, supra,* 474 U.S. at 112, 106 S.Ct. at 450; *Ahmad v. Redman, supra,* 782 F.2d at 412.

The inquiry into whether a person has voluntarily, knowingly and intelligently waived his *Miranda* rights "has two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (quoting *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) and *Brewer v. Williams, supra,* 430 U.S. at 404, 97 S.Ct. at 1242):

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine, supra,* 475 U.S. at 421, 106 S.Ct. at 1141 (quoting *Fare v. C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979)).

10. 28 U.S.C. § 2254(d) provides in pertinent part:

"In any proceeding instituted in a Federal Court by an application for a writ of habeas corpus by a person in custody pursuant to the judgement of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... shall be presumed to be correct, unless ...

"(8) ... the Federal court ... concludes that such factual determination is not supported by the record as a whole."

■ With respect to the first dimension—that of voluntariness—the focus of the inquiry is on the conduct of the police. *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Coercive police activity is "a necessary predicate" to finding that a waiver of *Miranda* rights was not voluntary. *Id.* 479 U.S. at 167, 107 S.Ct. at 522. The fifth amendment privilege is "not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon v. Elstad,* 470 U.S. 298, 304–05, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985). Rather, the voluntariness of a waiver of an individual's *Miranda* rights has "always depended on the absence of police overreaching. . . ." *Colorado v. Connelly, supra,* 479 U.S. at 170, 107 S.Ct. at 523.

Petitioner claims that he did not voluntarily waive his *Miranda* rights. The trial court found that although petitioner's interrogation lasted for approximately nine hours, it was not continuous. The detectives fed petitioner, let him use the bathroom, and allowed him to watch television for an extended period of time. It appears that petitioner answered the questions freely, and was described by the detectives as "always responsive." Presuming these subsidiary factual findings to be correct, and having carefully reviewed the record, the Court finds after an independent legal review that no coercion or duress occurred, and that petitioner voluntarily waived his *Miranda* rights prior to interrogation.

■ With respect to the second dimension of inquiry—whether the waiver was knowing and intelligent—the focus is solely on the mental ability of the individual. *Perri v. Director, Dep't of Corrections,* 817 F.2d 448, 452 (7th Cir.), *cert. denied sub nom Perri v. Lane,* 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987). In order for a waiver to be knowing and intelligent, a person must understand and comprehend the right in question as well as the consequences of abandoning that right. *Moran v. Burbine, supra,* 475 U.S. at 423, 106 S.Ct. at 1141.

■ However, a full appreciation of all the consequences of a waiver is not necessary for the waiver to be knowing and intelligent. *Oregon v. Elstad, supra,* 470 U.S. at 316, 105 S.Ct. at 1296; *Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987). Rather, the suspect need only understand that he has the right to remain silent, the right to request an attorney, and that "anything he says may be used against him." *Toste v. Lopes,* 701 F.Supp. 306, 312 (D.Conn.1987), *aff'd,* 861 F.2d 782 (2d Cir.1988), *cert. denied sub nom. Toste v. Meachum,* —— U.S. ——, 109 S.Ct. 3170, 104 L.Ed.2d 1032 (1989).

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Moran v. Burbine, supra,* 475 U.S. at 422, 106 S.Ct. at 1141.

Petitioner does not dispute that he was read his *Miranda* rights prior to the interrogation. He also concedes that after the detectives had read him his rights, he stated that he understood them and that he still wished to speak with them. The trial court found that "the record clearly established that the defendant was fully aware of the statements he was making. He responded to questions in a clear and rational manner." The trial court also determined that there was no indication of mental disease attributable to petitioner and that his ability to be attentive was unimpaired by drugs. Based on these subsidiary findings of fact, the Court determines that petitioner knowingly and intelligently waived his *Miranda* rights. Accordingly, petitioner's first ground for relief is rejected.

### 2. *Waiver of jury trial*

Petitioner's second ground for relief is that he did not knowingly and intelligently waive his right to a jury trial. He claims that the trial judge should not have granted his request for a bench trial over the vigorous objections of his attorney, and in light of the highly inflammatory evidence

that the judge had heard during the suppression hearings.

As previously noted, state court findings of fact must be given a presumption of correctness by a federal habeas court, and must be upheld unless those factual findings are not fairly supported by the record. 28 U.S.C. § 2254(d). *See Sumner v. Mata, supra,* 449 U.S. at 544, 101 S.Ct. at 767. This mandate, however, applies only to matters of "historical" fact and subsidiary factual determinations drawn from the historical facts; it does not apply to questions of law or mixed questions of fact and law. *Id.* at 545, 101 S.Ct. at 768.

The Second Circuit has held that a state court's finding that a waiver of a jury trial was knowing and intelligent is a mixed question of fact and law, subject to federal *de novo* review. *Matusiak v. Kelly,* 786 F.2d 536, 543 (2d Cir.), *cert. dism'd,* 479 U.S. 805, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986).[11] *See also United States ex rel. Williams v. DeRobertis,* 538 F.Supp. 899 (N.D.Ill.1982), *rev'd on other grounds,* 715 F.2d 1174 (7th Cir.1983), *cert. denied,* 464 U.S. 1072, 104 S.Ct. 982, 79 L.Ed.2d 219 (1984); *Phillips v. Murphy,* 796 F.2d 1303 (10th Cir.1986).

The right to trial by jury is "fundamental to American criminal jurisprudence." *United States v. Martin,* 704 F.2d 267, 271 (6th Cir.1983), and is explicitly protected by the Constitution. U.S. Const. Art. III, § 2. Since the right is so fundamental, it is not to be dispensed with routinely. *Patton v. United States,* 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). In order for a waiver of this right to be valid, it must be "express and intelligent," *Patton v. United States, supra,* 281 U.S. at 276, 50 S.Ct. at 253, and must comport with the waiver standard formulated in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). *Adams v.*

*United States,* 317 U.S. 269, 275–78, 63 S.Ct. 236, 240–41, 87 L.Ed. 268 (1942). *See Schneckloth v. Bustamonte,* 412 U.S. 218, 237, 93 S.Ct. 2041, 2052, 36 L.Ed.2d 854 (1973). To be valid under *Johnson v. Zerbst,* a waiver of certain constitutional rights must amount to an "intentional relinquishment of a known right or privilege." *Johnson v. Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. at 1023. "Waivers of constitutional rights must not only be voluntary, but must also be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970).

In the instant case, petitioner does not contest the voluntariness of his waiver of a jury trial.[12] Instead, he directs his attack solely at the second dimension of the waiver inquiry, arguing that the waiver was not knowing and intelligent. In order for a waiver to have been knowing and intelligent, the defendant must have understood the "nature of the right" and the consequences of waiving that right. *Estrada v. United States,* 457 F.2d 255, 256 (7th Cir.), *cert. denied,* 409 U.S. 858, 93 S.Ct. 143, 34 L.Ed.2d 104 (1972). *See Boykin v. Alabama,* 395 U.S. 238, 243–44, 89 S.Ct. 1709, 1712–13, 23 L.Ed.2d 274 (1969).

Waiver cannot be inferred from a silent record; there must be "an affirmative showing that [the waiver] was intelligent and voluntary." *Boykin v. Alabama, supra,* 395 U.S. at 242, 89 S.Ct. at 1711. The fact that a defendant has counsel is also relevant to determining whether he knowingly waived his right to a jury trial. *United States ex rel. Williams v. DeRobertis, supra,* 715 F.2d at 1175. In the instant case, when petitioner first stated his desire for a bench trial, the trial judge told him to discuss the matter very thoroughly with his attorney overnight. The following day, when petitioner continued to

---

11. Although this case involved a guilty plea, when a defendant enters a guilty plea he waives several constitutional rights, including the right to trial by jury, the right to confront his accusers, and the privilege against compulsory self-incrimination. *Matusiak v. Kelly, supra,* 786 F.2d at 543.

12. The record does not indicate any sign of coercion on petitioner's free will. Thus, had even had petitioner raised such a claim, it would fail.

insist upon a non-jury trial, the judge explained to him the risks involved.[13] The judge told petitioner that he was giving up the right to have twelve individuals decide his case, and instead was depending solely on the court. The judge also explained to petitioner that he had seen a lot of material that normally would not be submitted to the jury. Additionally, the judge pointed out to petitioner that he was going against the advice of his counsel. Petitioner stated that he understood all of this, and that he nonetheless wished to waive his right to a jury trial.[14]

Although a reviewing court might question the wisdom of petitioner's decision to have his case tried solely to a judge, it appears from the record that petitioner knowingly and intelligently made this choice, informed by both the judge and his attorney of the substantial risks involved. Under these circumstances, the Court finds that petitioner knowingly and intelligently waived his right to a jury trial:

> While many factors might enter into a decision to waive the right to trial by jury, and while an attorney's advice concerning the matter may often be followed by a defendant, given the attorney's experience and expertise, the defendant must ultimately decide for himself if he trusts the judgment of his fellow citizens with his fate, or if he would rather entrust it to the judgment of a solitary state judicial officer.

*Id.* at 1180.

■ Petitioner further argues that the trial judge erred in accepting his jury trial

---

13. The trial judge engaged in the following colloquy with petitioner:

Court: Now, there is also an application before me made by the defendant for a non-jury trial. At this time, I would inform the defendant that a non-jury trial, before me, that I now know the defendant's complete record and criminal history, criminal record. I have seen the video tapes and I have listened to this motion for days on end, and I have listened very closely to all of the witnesses. And, I ask this defendant whether or not he still is so inclined to ask for a non-jury trial before me?

Petitioner: Yes, sir ...

Giampa: I strongly oppose the non-jury trial. I believe that my client cannot get a fair trial if he gets a non-jury trial. There has been incredible prejudicial evidence presented before your honor ... I think if my client insists upon it, I must request 730 examination (competency hearing) for him.

Court: Mr. Coronado, will you please tell me why you want a non-jury trial in view of what your counsel has just said and stated on the record?

Petitioner: Well, sir, being that you are the judge, you have the case and you know what's happening with the case. I don't think I need anybody else to judge me. I like for you to prove whether I am innocent or guilty, being that you know the case.

Court: Well, as your counsel has pointed out, I have seen all the video tapes that were involved in this matter, I have heard a lot of extraneous material that normally would not be, because of my rulings, before a jury. I point that out to you and you still feel that I could be fair and impartial?

Petitioner: Yes, sir.

Court: Mr. Coronado, do you realize that by giving up your right to 12 people sitting there and deciding your faith and just depending on me, you are giving up 12 individual people looking at your case and making a decision about your case one way or another, do you realize that?

Petitioner: Yes sir, I understand that.

Court: You still want just me to handle it?

Petitioner: Yes, sir.

Court: Mr. Coronado, you are obviously going in the opposite direction than your counsel. You are going against his advice. You understand that, don't you?

Petitioner: Yes, sir.

Court: But assume that I grant you the waiver, grant your application, assume that I do. Would you cooperate with him in your own defense in the case, would you cooperate with your lawyer?

Petitioner: Well, being that he is my lawyer I have too.

Court: And you would do that?

Petitioner: Of course.

Court: You fully understand what you are doing?

Petitioner: Yes, sir, perfectly.

Court: Under those conditions, that you fully understand and have had a full opportunity to understand, you have had overnight to discuss this with your attorney and to think about it, and having read the statute that permits you to make this application and it is your determination, and I am now satisfied that you know what you are doing, I am granting [your] application.

14. Although the Second Circuit has not specified what a trial judge must tell a defendant before accepting a waiver of a jury trial, the Seventh Circuit requires that the trial judge explain to the defendant that a jury is composed of 12 members of the community, and that if a defendant waives a jury trial, a judge alone will decide his guilt or innocence. *Id.*

waiver without making a specific and separate determination that he was competent to waive this right. Although the judge did order a competency hearing to "determine [petitioner's] competency to stand trial ... [along with] [h]is knowledge and understanding of his ability to assist in his own defense," petitioner claims that a stricter standard must be applied when examining a defendant's competence to waive a jury trial.

While a waiver must have been made voluntarily, knowingly and intelligently, it must also have been made competently. *Johnson v. Zerbst, supra,* 304 U.S. at 465, 58 S.Ct. at 1023; *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966). Petitioner relies on *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966), to support his assertion that a more stringent standard of competency applies in waiving his jury right. In *Westbrook,* the Supreme Court held in a brief per curiam opinion that there is a distinction between a defendant's competence to waive the right to counsel at trial and his competence to stand trial. *Id.* However, the Supreme Court did not define the higher standard, and did not direct the discussion to any other constitutional right besides waiving right to counsel.

The Ninth Circuit in *Sieling v. Eyman,* 478 F.2d 211 (9th Cir.1973), a guilty plea case, read *Westbrook* to require a higher standard of competence whenever constitutional rights are waived. Thus, that court held that the standard of competence to plead guilty, and thus waive a jury trial, is higher than that required to stand trial. *Id.* at 214–15. Other Circuit Courts of Appeals, however, have rejected this reasoning and held that the standard of competence is no different. *See United States ex rel. Heral v. Franzen,* 667 F.2d 633 (7th Cir.1981); *Allard v. Helgemoe,* 572 F.2d 1 (1st Cir.), *cert. denied,* 439 U.S. 858, 99

S.Ct. 175, 58 L.Ed.2d 166 (1978); *United States ex rel. McGough v. Hewitt,* 528 F.2d 339 (3d Cir.1975); *Malinauskas v. United States,* 505 F.2d 649 (5th Cir.1974); *United States v. Harlan,* 480 F.2d 515 (6th Cir.), *cert. denied,* 414 U.S. 1006, 94 S.Ct. 364, 38 L.Ed.2d 242 (1973); *Wolf v. United States,* 430 F.2d 443 (10th Cir.1970). *See also United States v. Valentino,* 283 F.2d 634 (2d Cir.1960) (pre-*Westbrook* ).

The Second Circuit has not yet addressed this issue in the aftermath of *Westbrook,* but has suggested that a higher standard may not be appropriate. *See Suggs v. La Vallee,* 570 F.2d 1092 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978). Other courts in this district have rejected the *Sieling* distinction. *See Kelly v. Lefevre,* No. 81 Civ. 0491, slip op. (S.D.N.Y. January 13, 1982); *Sharp v. Scully,* 509 F.Supp. 493 (S.D.N.Y.1981). This Court finds persuasive the reasoning of those courts which have determined that the standard of competence required to waive constitutional rights other than the right to counsel is no higher than that required to stand trial.[15] In any event, the trial judge in the instant case made a specific finding at the conclusion of the competency hearing that petitioner was competent to waive his right to a jury trial. Thus, even were this Court to hold that a more stringent standard of competency should apply to a determination of competency to waive constitutional rights, that higher standard would arguably have been met in this case in light of the findings of the trial court in that regard.

"A trial judge's 'finding that a defendant is mentally competent to stand trial satisfies due process when the court finds that the prosecution has carried the burden of proving the defendant's competency by a preponderance of the evidence.'" *Baum v. Leonardo,* No. 88 Civ. 8181, slip op. at 6–7, 1989 WL 85786 (S.D.N.Y. July 25, 1989) (available on Lexis at 1989 U.S.Dist.

---

**15.** As the Seventh Circuit noted in *Franzen,* the standard enunciated by the Ninth Circuit in *Sieling* has proved rather unworkable, and that court has limited the scope of *Sieling* to allow the district court to reconstruct the competence of the defendant to plead guilty based upon the

evidence presented in connection with determining his competence to stand trial. *United States v. Franzen, supra,* 667 F.2d at 637, 637–38 n. 4. *See Makal v. Arizona,* 544 F.2d 1030 (9th Cir.1976), *cert. denied,* 430 U.S. 936, 97 S.Ct. 1563, 51 L.Ed.2d 782 (1977).

LEXIS 8395) (quoting *Brown v. Warden, Great Meadow Corr. Facility,* 682 F.2d 348, 353–54 (2d Cir.), *cert. denied,* 459 U.S. 991, 103 S.Ct. 349, 74 L.Ed.2d 388 (1982)).

Under a preponderance of the evidence standard of proof, in order to find the existence of a disputed fact in favor of the party who has the burden of persuasion, a factfinder is required only to find " 'that the existence of [the] fact is more probable than its nonexistence.' "

*Id.* at 352 (quoting *In re Winship,* 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)).

 At petitioner's competency hearing, two psychiatrists who had previously examined petitioner testified that they believed him able to understand the nature of the charges against him and to assist meaningfully in his defense. Thus, each opined that he was competent to stand trial. This Court has carefully reviewed the entire transcript of the competency hearing, which consists of over 200 pages of testimony and argument. The testimony of the psychiatrists is troubling. Cross-examination by petitioner's counsel revealed that only a few standard questions were asked by the psychiatrists during the examination, and that in essence the substance of petitioner's answers to those questions was irrelevant to their conclusions of competency. The witnesses had absolutely no independent recollection of the examination, which had occurred only a few weeks prior to the hearing. One of the doctors apparently indicated defense counsel when asked if she recognized petitioner in court. Upon cross-examination, neither witness was able to state with any degree of specificity the basis for their conclusion that petitioner was competent, or to suggest any answer petitioner could have given, or any fact about him they might learn,[16] which would have altered their conclusions.

In sum, the transcript of the hearing depicts a largely empty exercise in which no meaningful cross-examination could take place.

However, petitioner offered no evidence regarding his competency at the hearing. In addition, the trial court had the opportunity to observe petitioner's demeanor at the competency hearing as well as at the several prior proceedings that had already taken place. *Cf. Baum v. Leonardo, supra,* No. 88 Civ. 8181, slip op. at 8 (defendant's demeanor at trial relevant to determination whether competency hearing required). Under these circumstances, this Court must conclude that the prosecution did succeed in proving petitioner's competency by a preponderance of the evidence. Accordingly, petitioner's second ground for relief is denied.

### 3. *Sufficiency of the evidence*

Petitioner's final claim is that the evidence adduced at trial was insufficient to support his conviction and thus that his conviction is inconsistent with the due process clause. Petitioner contends that his conviction was based solely on circumstantial evidence, which was "weak and equivocal."

 Respondent argues that petitioner's claim that there was only circumstantial evidence is procedurally barred.[17] Petitioner did not raise this claim at trial. The prosecution, in its brief to the Appellate Division, argued that the claim was thus procedurally barred, but also argued that the claim was meritless. The Appellate Division affirmed without opinion.

Where a petitioner has not raised an issue in state court, "a procedural default does not bar consideration of a federal claim on ... habeas review unless the last state court rendering a judgment in the

---

**16.** For example, defense counsel asked the witnesses whether their opinion might be altered if they were told that petitioner had stated that he wanted to kill his mother or that he enjoyed throwing cats and dogs off rooftops to watch them suffer—hypothetical questions not without some factual basis in petitioner's case. Both witnesses insisted that these facts would not alter their opinions, but refused to give any

example of a fact which would cause them to find incompetency.

**17.** There does seem to be some direct evidence here, despite petitioner's claim that there is only circumstantial evidence. Perez testified that petitioner told him that he murdered Gutierrez.

case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (quoting *Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985) and *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983)). In the instant case, the last state court to render a judgment was the Appellate Division. Since the Appellate Division affirmed without opinion, that court cannot be said to have "clearly and expressly state[d] that its judgment rests on a state procedural bar" as required by the court in *Harris*. *See Matos v. Senkowski,* No. 89 Civ. 2961, slip op., 1990 WL 17680 (S.D.N.Y. February 20, 1990); *Lopez v. Scully,* 716 F.Supp. 736, 738–39 (E.D.N.Y.1989). Accordingly, the Court turns to the merits of petitioner's claim.

The standard of federal review of a habeas claim based on insufficiency of evidence is well-established. A court is not to conduct a *de novo* determination and is not required to:

> 'ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of a crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

*Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (emphasis in original) (citations omitted). *See also Reddy v. Coombe,* 846 F.2d 866, 869 (2d Cir.1988), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 334 (1988); *Mallette v. Scully,* 752 F.2d 26, 31

(2d Cir.1984). A petitioner challenging his conviction on this ground faces a heavy burden. *Gruttola v. Hammock,* 639 F.2d 922, 927 (2d Cir.1981).

In reviewing such a claim, the Court must "credit every inference that could have been drawn in the State's favor, whether the evidence being reviewed is direct or circumstantial." *Reddy v. Coombe, supra,* 846 F.2d at 869 (citations omitted). The verdict of the jury must be sustained if any "rational trier of fact could properly find or infer that the accused is guilty beyond a reasonable doubt." *Mallette v. Scully, supra,* 752 F.2d at 31.

A careful review of the trial transcript adequately supports the finding that a rational trier of fact could have found petitioner guilty of murder beyond a reasonable doubt. Viewing the testimony in a light most favorable to the prosecution, as is required, it is clear that the standard in *Jackson* has been met.

First, Perez testified at trial that petitioner confessed to the murder of Gutierrez during his attack on Perez. Perez also testified that before petitioner led him into the park, he exclaimed that it was "just a shame that its got to happen again." In addition, Alvarez stated that petitioner had had a relationship with Gutierrez before she was killed; that the two symbolized this relationship by wearing each other's clothing, in this case a gold belt; and that this was the same gold belt that was found wrapped around Gutierrez's dead body. Alvarez also testified to the tension between petitioner and Gutierrez that was created by the restraints posed by Gutierrez's parents on Gutierrez's social activities.

Further, petitioner showed a certain familiarity with some of the details of the killing. He told the detectives during his interrogation that he thought it would be impossible to drive and hold the decedent's body at the same time. As noted earlier, the detectives had not told petitioner that the decedent's body had been transported by a car to the Bronx after the murder. He also suggested to the detectives that

although he would tell them about Perez, they would have to "figure out" what happened to Gutierrez since they knew nothing about her.

Petitioner contends that many of the prosecution's witnesses were not credible, in particular attacking the truthfulness of Perez and Alvarez.[18] However, assessing the credibility of witnesses at trial is a matter for the fact-finder, not a federal court on habeas corpus review. Thus, viewing all of the evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could conclude beyond a reasonable doubt that petitioner murdered Gutierrez.

▪ Finally, petitioner argues that since the case against him relies entirely on circumstantial evidence, a more rigorous standard than "beyond a reasonable doubt" should have been applied. However, on federal habeas corpus review of a state conviction, the same standard applies to cases based on circumstantial evidence as those based on direct evidence. *Lee v. Scully*, No. 88 Civ. 7217, slip op., 1990 WL 67696 (S.D.N.Y.1990). The Supreme Court has stated that,

> circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury

must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954).[19] Thus, petitioner's claim that the evidence was insufficient to support a guilty verdict beyond a reasonable doubt, is denied.

## CONCLUSION

The Court has reviewed both Magistrate Tyler's Report and petitioner's objections, and has considered *de novo* those portions of the Report to which the objections pertain. In accordance with the Magistrate's recommendation, petitioner's application for a writ of habeas corpus is denied. The Report is adopted and the petition dismissed.

Inasmuch as an appeal from this Memorandum Decision would be frivolous, the Court certifies, pursuant to the in forma pauperis provisions of 28 U.S.C. § 1915(a), that such an appeal would not be taken in good faith. Furthermore, as the petition presents no questions of substance for appellate review, *see Alexander v. Harris*, 595 F.2d 87, 90 (2d Cir.1979), a certificate of probable cause will not issue.

It is so ordered.

---

18. Petitioner claims that Perez and Alvarez are not credible since they have a strong dislike for him, and because they made a number of contradictory statements.

19. Petitioner cites the standard enunciated in *People v. Taddio*, 292 N.Y. 488, 489, 55 N.E.2d 749 (1944), as the appropriate standard when a case relies on circumstantial evidence. That case required that, where the evidence against the accused is solely circumstantial, it must point "logically to the defendant's guilt and exclud[e] to a moral certainty every other reasonable hypothesis." *Id.* This is the standard that is applied under New York State law. *See* Prince, *Richardson on Evidence* § 148, at 119–120 (1973). However, it is well-settled that fed-

eral courts have no supervisory authority over state courts, *Chandler v. Florida*, 449 U.S. 560, 570, 582–83, 101 S.Ct. 802, 807, 813–14, 66 L.Ed.2d 740 (1981), and that federal habeas corpus review of state criminal proceedings under 28 U.S.C. § 2254 is limited to errors of constitutional magnitude. *See, e.g., Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Petrucelli v. Coombe*, 735 F.2d 684 (2nd Cir.1984). Thus, even assuming that the trial judge erred under state law, this claim would fail as it omits to allege a constitutional violation.