**UNITED STATES of America, Appellee,**

v.

**Pedro H. VALDEZ, Defendant,**

**Wasang Tomas Mock, Jorge Garcia, and Raul Rodriguez, Defendants–Appellants.**

**Nos. 102 to 104, Docket 92–1742, 92–1744 and 93–1015.**

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1993.

Decided Feb. 17, 1994.

Nancy Northup, Assistant United States Attorney, Southern District of New York, New York, N.Y. (Roger Hayes, United States Attorney, Southern District of New York, New York, N.Y., Nelson W. Cunningham, Assistant United States Attorney, Southern District of New York, New York, N.Y., of counsel), for Appellee.

Todd D. Greenberg, Addabbo & Greenberg, Forest Hills, N.Y., for Defendant–Appellant Wasang Tomas Mock.

Philip R. Edelbaum, New York, N.Y., for Defendant–Appellant Jorge Garcia.

Benjamin Heinrich, Bronx, N.Y., for Defendant–Appellant Raul Rodriguez.

Before: FEINBERG, CARDAMONE, and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Wasang Tomas Mock, Jorge Garcia, and Raul Rodriguez [collectively "the appellants"] appeal from judgments of conviction entered by the United States District Court for the Southern District of New York (Leisure, *J.*), following a three-week jury trial. The appellants were convicted on a six-count indictment charging the appellants with participating in a large scale crack and cocaine distribution organization ("the organization"). They were also charged with weapons offenses, and Mock was charged with perjury based on testimony he gave at an earlier trial of his co-appellants. After their convictions, Mock and Garcia were principally sentenced by the district court to life imprisonment, and Rodriguez to 248 months' imprisonment.

Mock, Garcia, and Rodriguez now appeal their convictions and the sentences imposed on a variety of issues. Although most of these claims are completely without merit, and are not worthy of further discussion, there are several issues that require discussion. The most significant is Mock's contention that testimony he gave at an earlier trial of his co-appellants was involuntary, in that he testified without knowledge that the district court (Lowe, *J.*) had delayed the execution of an arrest warrant for him in order to ensure his testimony. Mock argues that his lack of knowledge about his impending arrest rendered his testimony involuntary and therefore inadmissible at his later trial. Additionally, Mock contends that the district court in the second trial erred when it admitted the testimony into evidence without allowing the admission of the circumstances under which it was given. Although we find both those contentions ultimately unpersuasive, we will discuss them in depth.

Additionally, appellants contend that the district court erred in charging the jury, and they challenge to the sentences imposed upon them. For the reasons stated below, we affirm the judgement of the district court as to all the issues on appeal.

## BACKGROUND

Evidence accepted by the jury at trial demonstrated that, between 1986 and 1990, Mock, Garcia, Rodriguez, and others participated in a retail and wholesale crack and cocaine distribution organization located in Manhattan. Mock and Garcia were partners in running the organization, and Rodriguez performed various services for the organization.

There are two trials involved in this case. In the first, in July 1991 before Judge Lowe of the Southern District, Garcia and Rodriguez were tried for their involvement in the conspiracy. Mock had not yet been arrested, and he testified at that trial on behalf of Garcia. At the time of his testimony, he was not aware that there was a warrant out for his arrest, a warrant that was executed immediately following his testimony as per the instructions of Judge Lowe. Judge Lowe delayed the execution of the warrant until Mock testified out of concern that arresting Mock prior to his testimony would disadvantage the defendants. This first trial ended in a hung jury on August 2, 1991.

After the mistrial, a second indictment was filed on August 13, 1991 against all three appellants charging them with the following: conspiracy to possess with intent to distribute 50 grams and more of crack cocaine and five kilograms and more of cocaine, in violation of 21 U.S.C. § 846; possession with intent to distribute approximately 2.9 kilograms of crack cocaine and approximately 3.7 kilograms of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(B), and in violation of 18 U.S.C. § 2; and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924 and 2. The indictment also charged Mock with perjury, in violation of 18 U.S.C. § 1623, for his testimony at the first trial of his co-appellants.

The second trial began before Judge Leisure of the Southern District on January 6, 1992. At the second trial, the government substantiated to the jury's satisfaction the involvement of the appellants in the drug conspiracy. The government's witnesses at trial included an accomplice witness, Pedro

Valdez, who began working for the organization in January 1990 and cooperated with the government after an unrelated arrest. The government also presented the testimony of Nelson Almonte, a Drug Enforcement Agency ("DEA") confidential informant, who attested to his involvement in a purchase of crack from the organization. Other witnesses, including experts, also testified on behalf of the government. Physical evidence introduced included extensive drug paraphernalia, lease and rent payment records, wire transfer records, a rolodex seized from Mock's home, and tape recordings of conversations between Almonte and Mock after the appellants had been arrested.

The second trial ended on January 24, 1992, when the jury returned a verdict of guilty against the appellants on all counts. On July 23, 1992, the district court sentenced both Mock and Garcia to life imprisonment, plus a mandatory five-year consecutive sentence on the weapons count and special assessments. On December 8, 1992, the district court denied Garcia's and Mock's motion for a new trial pursuant to Fed.R.Crim.P. 33, based on newly discovered evidence. On January 5, 1993, the district court sentenced Rodriguez to 248 months' imprisonment, including a mandatory five-year sentence on the weapons count, a five-year term of supervised release, and a special assessment.

The appellants have appealed their convictions and sentences on a variety of grounds. Most of these grounds do not merit any discussion, because the legal standards for their resolution are well-established and unchallenged. A few of the issues, however, present novel questions for our consideration, and will be discussed at length. The background involving those claims will be recounted as necessary in the appropriate Discussion sections.

## DISCUSSION

### I. *Mock's Testimony at the First Trial*

Mock argues that the district court erred in allowing the government to introduce his testimony from the earlier trial of his co-appellants.

### A. *Background*

As noted above, appellants Garcia and Rodriguez were tried in July 1991 before Judge Lowe in the Southern District. Mock at that time was not a co-defendant, and had not yet been arrested in connection with this case. On July 30, 1991, Garcia called Mock as his first witness. At sidebar, the government informed Judge Lowe that there was a warrant for Mock's arrest. The court denied the government's request to execute the warrant immediately, mainly because executing the warrant would deprive the defendants of the benefit of Mock's testimony. The judge then excused the jury, and adjourned with counsel to the robing room.

In the robing room, the district judge indicated that if the warrant was executed prior to Mock's testimony, "the defendants would have a legitimate claim that the government prevented this man's testimony." The Assistant United States Attorney ("AUSA") representing the government agreed that there was a problem, and noted that Mock had rights that were implicated in the situation.

The record indicates that the AUSA then declared that although Mock and other possible witnesses for the defense were not at that time represented by an attorney, they had been told that "they might subject themselves to arrest if they come to court." Additionally, an attorney for the defense stated that the witnesses had been warned to hire an attorney. The government agreed to forestall Mock's arrest until Mock had testified, and Judge Lowe made arrangements to have Mock arrested out of sight of the defendants or the jury once he had testified.

Mock, who was not represented by counsel at the time, proceeded to testify on Garcia's behalf. He stated that he did odd jobs to support himself, denied being a drug dealer, had known Garcia for 20 years and had never known him to sell or use drugs, and had visited Garcia's apartment (which the government showed was the headquarters for the organization). Mock did testify that he was aware that there was "always a chance" of being arrested if he came to testify, but that he wanted to "clear his name." After Mock's testimony, he was arrested outside the courtroom.

At the second trial, Mock's testimony at the first trial was admitted into evidence to support the perjury charges and to show that he had been in the apartment in which the drug operation was organized. After a motion to suppress, Judge Leisure denied the motion and admitted the testimony:

Mock is a high school graduate and a former partner in a business. He is 32 years old, and is no stranger to the Federal criminal justice system, having already been tried once and convicted. Mock was not brought in Judge Lowe's courtroom by force or by use of process. Rather, he appeared to testify to "clear my name," despite being warned that there would be DEA agents at the trial and that he had been implicated in the drug conspiracy then on trial.

Although the district court admitted the testimony, the court did not admit the underlying circumstances under which the testimony was given, finding that Mock's lack of knowledge as to the arrest warrant was not relevant evidence.

### B. *Discussion*

Mock now argues that District Judge Leisure erred in admitting his prior testimony into evidence at the second trial, on the grounds that his statements in the first trial were not voluntarily made and that District Judge Lowe had an obligation to inform him of his imminent arrest. Mock tries to characterize his testimony in the first trial as a custodial confession, subject to Fifth Amendment restrictions on the use of confessions in criminal trials.

There are two issues implicated by the district court's choice to have Mock testify without being informed about his impending arrest. The first is whether Mock's testimony can be considered involuntary due to his lack of knowledge about the arrest warrant. The second is whether the district court had an obligation to inform Mock about the arrest warrant, or at least to ensure that Mock had the opportunity to consult with counsel before testifying.

### (1) *Voluntariness*

Mock argues that his testimony was involuntary, in that he was deprived of information necessary for him to determine whether he should testify. He contends that his testimony was not the result of his free choice, because he would not have chosen to testify had he known that he was about to be arrested. He further argues that his testimony constituted a confession that should have been suppressed because he was never given the *Miranda* warnings for custodial interrogations.

■ This latter contention can be quickly dismissed. In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibited statements given by a suspect during "custodial interrogation" without a prior warning. The Court suggested that the *Miranda* warnings apply, however, only in the context of "incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* at 445, 86 S.Ct. at 1612. Moreover, the Court has since noted that "[i]t is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation." *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). In the instant case, Mock was neither in custody nor subject to official interrogation; rather, he came freely to court to testify on behalf of his colleagues. His questioning by defense counsel and the government attorney is certainly not the type of situation envisioned by the Court in *Miranda* as requiring prophylactic warnings. *See United States v. Kilgroe*, 959 F.2d 802, 804–05 (9th Cir.1992). Consequently, he was not entitled to *Miranda* warnings prior to his testimony.

■ Even though Mock was not entitled to *Miranda* warnings, his statements during his testimony would still be inadmissible in the later trial if they were made involuntarily. Under standard voluntariness analysis, we inquire "into all the circumstances surrounding the law enforcement officials' conduct to ascertain whether it overcame the accused's will to resist and brought about a confession that was not freely self-deter-

mined." *Campaneria v. Reid,* 891 F.2d 1014, 1019–1020 (2d Cir.1989), *cert. denied,* 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991). Three factors are relevant to this inquiry: (1) the conduct of the law enforcement officers; (2) the conditions under which the interrogation occurred; and (3) the accused's background. *See United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991).

This case's singularity, however, makes this inquiry somewhat complex, because standard voluntariness analysis does not squarely apply to these facts to aid us in resolving the issue. The three factors clearly point to the admissibility of Mock's testimony, but only because the misconduct averred by Mock does not snugly fit into that three-factor examination. The first two factors anticipate stationhouse-type confessions given after questioning by police officers, not testimony given in open court pursuant to questions from attorneys. Moreover, as the district court found, even the third factor does not weigh heavily in Mock's favor because of his education and familiarity with legal procedures.

The fact that the standard *Anderson* three-factor test does not clearly point to involuntariness, however, should not end our inquiry. Voluntariness analysis is usually employed to determine whether a statement given to police in an extra-judicial proceeding can be admitted into court, and focuses on whether the police overcame the accused's free will through coercion or manipulation. The situation here, however, is very different. Here, Mock contends that a statement given under oath in open court, at the behest not of the government but of criminal defendants, should be excluded because the district court did not have him arrested before he could testify and thereby incriminate himself. As one might anticipate, the state of the law has not developed so fully as to provide a well-established test for evaluating such a contention.

Similar arguments, however, have been rejected in the related context dealing with the voluntariness of a waiver of *Miranda* rights during custodial interrogation. The foundation for Mock's appeal on this issue is the contention that the district court or the government was under an obligation to inform him that he was subject to imminent arrest after his testimony, especially where Mock argues that he might not have testified had he known of the arrest warrant. In a comparable situation, though, the Supreme Court held that the failure of police to inform the defendant of the efforts of an attorney hired by the defendant's sister to reach him did not cause the defendant's waiver of his *Miranda* rights to become involuntary. *See Moran v. Burbine,* 475 U.S. 412, 413, 106 S.Ct. 1135, 1136, 89 L.Ed.2d 410 (1986). *Moran* dealt specifically with the voluntariness of a waiver of *Miranda* rights, rather than the voluntariness of testimony, but the rationale is instructive for the instant case. In *Moran,* the Court held that the defendant did not need to know that an attorney had been retained on his behalf in order to "knowingly waive his Fifth Amendment rights to remain silent and to the presence of counsel." *Id.* at 413, 106 S.Ct. at 1136. Because the defendant did not need that information, the failure to provide the information to him did not implicate those rights.

More significantly for the instant case, the Court noted that "[e]vents occurring outside the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* This is consistent with other holdings by the Supreme Court that a criminal defendant need not have perfect knowledge of all the circumstances and consequences of his waiver of Fifth Amendment rights in order for his confession to be voluntary. *See Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 858, 93 L.Ed.2d 954 (1987) (holding that "suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily" waived Fifth Amendment privilege); *Oregon v. Elstad,* 470 U.S. 298, 317, 105 S.Ct. 1285, 1297, 84 L.Ed.2d 222 (1985) (holding that prior unwarned statement did not undermine voluntariness of waiver of Fifth Amendment rights in subsequent statement given after warnings, stating that defendant need not have a "full and complete appreciation of all of the conse-

quences flowing from the nature and the quality of the evidence in the case" in order to make a voluntary confession); *California v. Beheler*, 463 U.S. 1121, 1125 n. 3, 103 S.Ct. 3517, 3520 n. 3, 77 L.Ed.2d 1275 (1983) (per curiam) (stating that defendant's confession was not involuntary despite defendant's argument that he was unaware of the consequences of his participation in interrogation); *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969) (holding that defendant's confession was not involuntary even though it was made in reliance on misrepresentation by police of confession by another suspect).

We think the reasoning in the above cases can be extended to the instant one. We do not see how Mock can argue that the information withheld from him is of a higher constitutional caliber, for example, than the information withheld from the defendant in *Moran*. The fact that Mock's knowledge of his impending arrest might have induced him to choose not to testify does not mean that he was entitled to that knowledge any more than the defendant in *Moran* was entitled to know about the retained attorney. Although it is information that Mock might have found useful, it is not information the denial of which vitiates the voluntariness of his decision to testify. This is consistent with decisions by other courts in the context of the voluntariness of a waiver of *Miranda* rights. *See Agee v. White*, 809 F.2d 1487, 1494–95 (11th Cir.1987) (holding that where police did not take affirmative steps to mislead defendant, confession was voluntary even if defendant misunderstood consequences of confession); *Ahmad v. Redman*, 782 F.2d 409, 413 (3d Cir.) (accepting district court's findings of fact, ruling that defendant waived his rights because it was shown that he understood *Miranda* warnings), *cert. denied*, 479 U.S. 831, 107 S.Ct. 119, 93 L.Ed.2d 66 (1986); *Coronado v. Lefevre*, 748 F.Supp. 131, 139 (S.D.N.Y.1990) (rejecting defendant's contention that his lack of understanding vitiated voluntariness of confession); *Brooks v. Zimmerman*, 712 F.Supp. 496, 499 (W.D.Pa.1989) (finding that defendant's confession was voluntary where defendant argued that he did not know nature of charge against him when he confessed); *Toste v. Lopes*, 701 F.Supp.

306, 313 (D.Conn.1987) (rejecting defendant's contention that lack of intelligence and personality disorder indicated that defendant could not understand *Miranda* warnings); *McCarthy v. Bronson*, 683 F.Supp. 880, 886 (D.Conn.1988) (rejecting contention that confession was involuntary where defendant argued that police's promise of drug treatment induced him to confess). Simply put, Mock's lack of knowledge about the arrest warrant does not affect the voluntariness of his testimony.

We also note that there is a question whether the withheld information would have even made a difference. Mock admitted during his testimony that he was aware that he might be arrested sometime in the future, stating that there was "always a chance" that he could be arrested for his alleged involvement in the narcotics operation, but that he wanted to clear his name. This shows that even though Mock did not have the specific knowledge of his impending arrest, he was generally aware of this danger and testified regardless. Although we find that the failure to inform Mock about the arrest warrant did not vitiate the voluntariness of his testimony, we note that his apparent understanding of his precarious situation, and disregard of this danger, is an additional basis for finding that the withholding of the information did not impact his free choice to testify.

### (2) *The District Court's Obligation*

■ As demonstrated above, Mock's lack of knowledge about his impending arrest did not vitiate the voluntariness of his testimony. This does not, however, end our inquiry, because Mock also argues that Judge Lowe had an independent obligation in the interest of fairness to protect his constitutional rights in her courtroom. Although the government's actions in this case as an advocate were entirely proper, there is some question as to whether the district court should have intervened to protect and inform Mock of his situation or at least ensure that he was represented by counsel.

At least four other circuits have expressly held that the district court has the inherent discretion to warn a witness about his consti-

tutional rights, especially if the court perceives that the witness might incriminate himself. *See United States v. Arthur,* 949 F.2d 211, 215–16 (6th Cir.1991) (holding that although district court has discretion to warn witness of possibility of incriminating himself, district court abused discretion by repeatedly encouraging witness not to testify); *United States v. Silverstein,* 732 F.2d 1338, 1345 (7th Cir.1984) (holding that district court correctly exercised authority to caution witness against "inadvertent abandonment" of privilege against self-incrimination), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985); *United States v. Colyer,* 571 F.2d 941, 946 (5th Cir.) (holding that "court should be alert to any indicators that the witness wishes to invoke the privilege against self-incrimination," but that district court made harmless error in assuming witness would invoke privilege without asking), *cert. denied,* 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978); *United States v. Morrison,* 535 F.2d 223, 228 (3d Cir.1976) (holding that although district court correctly used its discretion to warn witness of constitutional rights, prosecutor's barrage of warnings served to intimidate witness into invoking privilege, thereby prejudicing rights of accused).

■ We agree that a district court certainly has the discretion to ensure that a witness in danger of unwittingly incriminating himself is aware of his constitutional privilege, but that exercise of this discretion must be carefully tailored to ensure that warnings do not become threats. A district judge warning a witness must be sure that she does not abuse that discretion by intimidating a witness into silence. *See Webb v. Texas,* 409 U.S. 95, 97–98, 93 S.Ct. 351, 353–354, 34 L.Ed.2d 330 (1972) (per curiam) (holding that trial judge committed error when he "gratuitously singled out" one witness for lengthy and intimidating warnings about perjury); *Arthur,* 949 F.2d at 216.

In the instant case, Mock argues the converse of *Webb* and *Arthur,* that the district court abused its discretion precisely by *not* cautioning him about his constitutional privilege. At the very least, Mock argues, the district court should not be instrumental in ensuring that the witness not be aware of important facts relating to his choice whether to take the stand. According to Mock, Judge Lowe's actions were improper in that the judge exercised her discretion not to protect Mock's rights but to conceal them.

There is no question that Judge Lowe was put into a very difficult situation by the circumstances of Mock's testimony. The judge was forced on the spur of the moment to balance the right of the defendants to put on a witness on their behalf, the governmental interest in placing Mock under arrest, and Mock's interest in perhaps being specifically aware of the arrest warrant (as opposed to his general awareness that he had been implicated in the conspiracy). We have little doubt that the ingenuity of attorneys is such that, if Judge Lowe had chosen to inform Mock of the warrant, we would now be adjudging a contention that the court's interference with the presentation of Garcia's and Rodriguez's case violated their rights to a fair trial. *See Silverstein,* 732 F.2d at 1343–44 (stating argument for defendants that district judge improperly exercised discretion to warn witness about rights).

Even though we are sympathetic to Judge Lowe's predicament, however, we are troubled by the district court's choice to deliberately delay the execution of an arrest warrant to ensure a witness's testimony at trial. There is something vaguely inappropriate about the district judge arranging matters so that Mock's testimony on behalf of the defendants would not be jeopardized by execution of the arrest warrant. Although Judge Lowe clearly had the interests of the defendants in mind, she disregarded the possibility that Mock's interests might need protection. We think that the district court would have better exercised its discretion by ensuring that Mock was represented by counsel, or to caution Mock about the consequences of his testimony. Even though Mock did not have a Fifth Amendment right to the information, the district court's determination to withhold the information itself implicates concerns of fundamental fairness of the courtroom.

Ultimately, however, Judge Lowe's actions were within her discretion. Although we might disagree with Judge's Lowe's resolu-

tion of the dilemma, we must respect the judge's exercise of her inherent discretion in this matter. Mock's assertions to the contrary, the district court in this instance was under no overriding obligation to inform him of the impending arrest warrant. As was made clear in *Silverstein,* among other cases, a district judge has the discretion to caution a witness as to the relinquishing of his constitutional privilege against self-incrimination. Discretion to act, though, presupposes a discretion to *not* act. That a court has the *authority* to caution a witness does not imply that the court has an *obligation* to do so. Judge Lowe's exercise of that discretion, while perhaps imperfect, did not cause such fundamental unfairness that would require suppression of Mock's testimony.

Moreover, although we are troubled by the role taken by the district court in delaying execution of the warrant, we note that Mock was in a very real sense aware of his peril and yet chose to fabricate his entire testimony. As noted earlier, we doubt whether warnings from the district judge would have made a difference. In any event, we will not overturn the district court's exercise of its discretion absent an abuse of that discretion, and we do not find such an abuse present in this case.

For these reasons, we find that Mock was not entitled to the information withheld from him, either due to constitutional guarantees or considerations of fundamental fairness.

## II. *Evidence of Voluntariness of Mock's Testimony*

■ There is another issue raised by the admission of Mock's testimony in the first trial into evidence at the second trial. Although District Judge Leisure admitted the testimony into evidence at the second trial, he did not allow Mock to introduce the circumstances under which Mock testified. Mock had wished to demonstrate that his testimony was procured through inappropriate means in order to influence the jury to disregard the substance of his statements. He now argues that the exclusion of the evidence was an abuse of discretion, and that the district court was required to admit the

underlying circumstances of his "confession" under 18 U.S.C. § 3501.

■ A district court judge is in the best position to evaluate the admissibility of offered evidence. *See United States v. Torres,* 901 F.2d 205, 234 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). For that reason, we will overturn a district court's ruling on admissibility only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally. *See United States v. Cruz,* 797 F.2d 90, 95 (2d Cir.1986); *United States v. Moon,* 718 F.2d 1210, 1232 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

Mock contends that 18 U.S.C. § 3501 governs the determination of whether to admit the underlying circumstances of his testimony before Judge Lowe. Specifically, Mock argues that the district court was required under § 3501(a) to "permit the jury to hear relevant evidence on the issue of voluntariness and . . . instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." 18 U.S.C. § 3501(a).

Section 3501 governs the admissibility of confessions, and its applicability therefore depends on whether we can characterize Mock's testimony as a confession. Again, as noted earlier, we doubt that Mock's testimony constituted a "confession" in the actual sense. Section 3501(e), however, defines confession rather broadly: "any self-incriminating statement made or given orally or in writing." 18 U.S.C. § 3501(e). This would seem to be satisfied by Mock's prior testimony, in which he made statements that at the very least tied him to the defendants in such a way as to implicate him in their conspiracy.

Even if Mock's testimony could constitute a "confession" for purposes of §§ 3501(a) and (e), however, subsection 3501(d) limits the applicability of the entire section, stating that

> [n]othing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person

who made or gave such confession was not under arrest or other detention.

18 U.S.C. § 3501(d). Subsection (d) therefore places two limitations on the applicability of the entire section: (1) if the confession was given without interrogation; and (2) if the confessor was not under arrest or detention at the time the statement was made. *See United States v. Bernett,* 495 F.2d 943, 972 (D.C.Cir.1974) (Wilkey, *J.,* concurring) (stating that Congress's intent in § 3501(d) was to create a "broad exception to the procedural requirements of [§] 3501"); *see also United States v. Bailey,* 728 F.2d 967, 970 (7th Cir.) (citing concurrence in *Bernett,* holding that § 3501(d) creates an exception to the procedural requirements of entire section), *cert. denied,* 467 U.S. 1229, 104 S.Ct. 2686, 81 L.Ed.2d 881 (1984).

Both of these limitations apply in this case. Mock was subject to cross-examination during his testimony before Judge Lowe, but although an effective cross-examination can perhaps be as unpleasant as many interrogations, there is a tremendous legal distinction between the two. Moreover, as the district court found, Mock was not under arrest or detention at the time of his testimony. Mock came to court freely in order to testify on behalf of the defendants, and was unaware (as per Judge Lowe's instructions) of his imminent arrest.

Application of § 3501(d) indicates that Mock's testimony, even though possibly incriminating, is not a "confession" subject to the restrictions of the rest of the section. Therefore, the requirements of § 3501(a), which mandates among other things the admission of the underlying circumstances to voluntary confessions, are not operative to compel the district court to admit the evidence concerning Mock's testimony. *See United States v. Colon,* 835 F.2d 27, 30–31 (2d Cir.1987) (holding that requirements of § 3501 do not apply, because statement was spontaneous and not the product of interrogation), *cert. denied,* 485 U.S. 980, 108 S.Ct. 1279, 99 L.Ed.2d 490 (1988); *United States v. Diezel,* 608 F.2d 204, 207 (5th Cir.1979) (holding that no voluntariness hearing required under § 3501 where statement was volunteered and was not in response to interroga-

tion); *United States v. Vasta,* 649 F.Supp. 974, 988–99 (S.D.N.Y.1986) (holding that a voluntariness hearing under § 3501 not required where defendant spoke out on his own, not in response to interrogation).

Mock cannot therefore rely on § 3501 to require the admission of the circumstances of his testimony in the first trial. He can only argue that the district court abused its discretion as to the relevancy of those underlying circumstances. Because we find that the district court did not abuse its discretion, we affirm the court's judgment on this issue.

III. *Charge on Alcohol Abuse*

The only other substantive claim by the appellants that requires any discussion is their contention that the district court erred in refusing to charge the jury regarding accomplice witness Valdez's alleged alcoholism. Valdez had testified through an interpreter at trial that he drank fairly heavily, three or four drinks on a given day, but that he did not drink constantly or think his drinking was a problem. This led to extensive cross-examination on his drinking habits, but Valdez stated that he never became inebriated and did not believe that drinking affected his memory.

At the close of evidence, Mock requested that the court instruct the jury that Valdez was an alcohol abuser whose testimony must be carefully scrutinized. The district court concluded that such a charge was not appropriate, because there was no evidence that Valdez used alcohol at the time the events at issue in the trial took place. The appellants now contend that this refusal to charge the jury was error.

In order to prevail on this claim, the appellants must show that their requested charge accurately represents the law, and also that the charge actually given prejudiced their rights to a fair trial. *See United States v. Ouimette,* 798 F.2d 47, 49 (2d Cir.1986), *cert. denied,* 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988). They can make no such showing. There was no proof that Valdez was an alcoholic, nor proof that Valdez's drinking impacted on the events in question at trial. The jury was free to take Valdez's

admitted drinking into consideration for the weight of his testimony, and also free to accept the defense's well-argued admonishments on closing argument that Valdez was an untrustworthy drunk. The jury did not, however, need a charge that it should carefully scrutinize Valdez's testimony because of his drinking, especially since the district court clearly instructed the jurors that they had the authority and responsibility to determine the credibility of witnesses based on any matter in evidence. Even in the case of a charge related to drug use, which was the instruction upon which the appellants' proposed charging language was based, the instruction obviously need not be given at the district court's discretion where there is insufficient evidence to support it. *See United States v. Dempewolf,* 817 F.2d 1318, 1321 (8th Cir.) (refusal of drug-addict charge not error where there was factual dispute over whether witness was addict), *cert. denied,* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987); *United States v. Andrus,* 775 F.2d 825, 853 (7th Cir.1985) (refusal of drug-addict charge not error where possible drug addiction of witness was subject to extensive cross-examination on issue and jury otherwise charged on credibility matters). Although Valdez's drinking was obviously a factor for the jury to consider in assessing the credibility of his testimony, the evidence did not support that he was an alcoholic or was drinking at the time of events to which he was attesting, and there was no need for a specific instruction on the matter of his alleged alcoholism. For these reasons, the appellants were not prejudiced by the district court's decision to decline to charge the jury as requested.

## IV. *Other Substantive Issues*

The appellants raise a number of other substantive issues, none of which warrant further discussion. These include the appellants' claims that: the government failed to properly disclose evidence to the appellants at the first trial and at the second trial; this failure to disclose evidence should have barred retrial of the appellants under the Double Jeopardy Clause; the district court improperly evidenced favoritism to the government; the district court erred in various evidentiary rulings; the district court improperly denied Rodriguez's severance motion; and the district court improperly denied the appellants' motion for a new trial.

We have examined all of these contentions, and find them to be without merit.

## V. *Sentencing Issues*

The appellants raise various claims against their sentences, none of which have merit.

## A. *Life Sentences*

■ Mock and Garcia argue that their life sentences violate the Eighth Amendment's guarantee against cruel and unusual punishment, since they are merely middle-level drug dealers. They contend that, regardless of the Sentencing Guidelines' calculations, they are not deserving of so severe a punishment.

When reviewing a sentence imposed by the district court, "it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits." *Solem v. Helm,* 463 U.S. 277, 290 n. 16, 103 S.Ct. 3001, 3010 n. 16, 77 L.Ed.2d 637 (1983). For that reason, successful challenges to the constitutionality of particular sentences are extremely rare. *See Hutto v. Davis,* 454 U.S. 370, 374, 102 S.Ct. 703, 705, 70 L.Ed.2d 556 (1982).

We have previously ruled that sentences of life imprisonment for narcotics dealers are not "cruel and unusual" within the meaning of the Eighth Amendment. *See United States v. Torres,* 941 F.2d 124, 127–28 (2d Cir.1991). Here, the appellants' sentences were based on the amount of narcotics manufactured and seized, their leadership role in the conspiracy, and, in Mock's case, obstruction of justice. Although these factors result in an undesirable sentence for Mock and Garcia, life sentences are not constitutionally disproportionate given these facts.

### B. *Mock's Leadership Role*

 Mock argues that the district court erred in increasing his offense level pursuant to U.S.S.G. § 3B1.1(a) for his leadership role in the conspiracy. Such a finding by the court will not be disturbed unless clearly erroneous. *See United States v. Parker,* 903 F.2d 91, 103 (2d Cir.), *cert. denied,* 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990).

The government presented voluminous evidence of Mock's involvement in the conspiracy. He gave workers instructions, paid salaries, collected drug proceeds, disbursed money for bills, and handled customers. He also maintained the organization's drug records, in a date book introduced at trial. Mock seizes on the fact that he did not participate in the negotiations with undercover federal agent Almonte, but that fact alone, standing by itself, does not call the district court's conclusions into question. The fact that Mock did not actively participate in one drug transaction does not by itself show that he did not have a leadership role in the conspiracy.

### C. *Obstruction of Justice*

 Mock argues that the district court's imposition of a two-level increase for obstruction of justice pursuant to U.S.S.G. § 3C1.1 was unwarranted. The district court imposed the increase for Mock's perjury at the first trial before Judge Lowe, and for Mock's ultimately unsuccessful attempt to disguise his handwriting when giving exemplars under subpoena for comparison with his date book of drug records. Mock does not challenge any factual findings, but simply argues that as a matter of law the district court erred in using those two actions as a basis for the obstruction enhancement.

Section 3C1.1 provides for a two-level increase in the offense level "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Mock argues that this section should not apply to his attempt to disguise his handwriting, because his actions should be taken into account when assigning a sentence within the particular Guideline range. As support for this proposal, Mock cites to *United States v. Restrepo,* 936 F.2d 661, 668 (2d Cir.1991), wherein we discussed a district court's consideration of a defendant's attempt to withhold a writing exemplar when selecting a sentence within the Guideline range. This is not much support for Mock, however, because in *Restrepo* we discussed with approval the possibility of an obstruction enhancement for the exact type of behavior exhibited by Mock in this case. *See id.* at 668–69 (assuming without deciding that an obstruction enhancement would be appropriate for withholding writing exemplars). In any event, there are few better examples of a classic obstruction of justice than a defendant who refuses to give handwriting samples when compelled by a subpoena. His disguise of his handwriting made difficult the comparison of his writing with that in the drug transactions notebook seized by the government, thus hindering the government in its investigation.

Mock also argues that his false testimony cannot be the basis of an increase because it did not relate to "the instant offense," as required by U.S.S.G. § 3C1.1. Mock notes that the perjury took place at the earlier trial, not the one at which he was convicted. The Guidelines, however, do not state that the perjury has to be committed in the instant *trial,* just in the instant *offense.* Mock committed perjury while an investigation was ongoing for the conspiracy, and he lied in order to cover up his and his co-conspirators' roles in the conspiracy. *See United States v. Irabor,* 894 F.2d 554, 556 (2d Cir.1990) (holding that obstruction enhancement applies whether conduct occurred before or after commencement of judicial proceedings).

Mock cites to the district court opinion in *United States v. Banks,* 751 F.Supp. 1161, 1166 (M.D.Pa.1990), *aff'd,* 931 F.2d 52 (3d Cir.1991), wherein the court stated that the obstruction adjustment does not apply "where the defendant testifies untruthfully in the case of another defendant." In that case, though, the defendant in question committed perjury at the trial of a co-defendant who was tried simultaneously, although the defendant did not testify in his own case. The

perjury, therefore, took place after the investigation of the offense for which the defendant was charged, and although it took place simultaneously to his prosecution, it was unrelated to his "instant offense." As the district court stated, "we are of the view that the term 'instant offense' as used in the commentary and the guideline itself is probably limited to the offense or case against the defendant ... and does not encompass the case against [the co-defendant]." *Id.* In Mock's case, however, his perjury took place during his instant offense, because he was under investigation by the government for his involvement in the conspiracy at the time that he testified at the first trial. For these reasons, the obstruction enhancement was appropriate.

## CONCLUSION

We have examined all of the appellants' contentions, and find them to be without merit. For the above reasons, we affirm the judgment of the district court.