12-647-cr
United States v. Garza-Gonzalez

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at 40 Foley Square, in the City of New York, on the 21st day of February, two thousand thirteen.

Present:   AMALYA L. KEARSE,
           ROBERT A. KATZMANN,
           RAYMOND J. LOHIER, JR.,
                  *Circuit Judges.*
_____

UNITED STATES OF AMERICA,

                  Appellee,

                  - v -                    No. 12-647-cr

FAUSTINO GARZA-GONZALEZ, AKA FAUSTO,

                  Defendant,

VIKRAM DATTA,

                  Defendant-Appellant.
_____

For Appellee:              PETER M. SKINNER (Alvin L. Bragg, Jr., and Diane Gujarati, *on the brief*), Assistant United States Attorney, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, N.Y.

For Defendant-Appellant:   DIARMUID WHITE (Brendan White, *on the brief*), White & White, New York, N.Y.

Appeal from the United States District Court for the Southern District of New York (Kaplan, *J.*).

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court be and hereby is **AFFIRMED**.

Defendant-Appellant Vikram Datta appeals from a February 8, 2012, amended judgment of conviction entered by the United States District Court for the Southern District of New York (Kaplan, *J.*) following a two-week jury trial. Datta, the owner of a perfume business with a warehouse near the border between Mexico and the United States, was convicted for participating in a money laundering scheme by selling millions of dollars of perfume for cash with knowledge--or in reckless disregard of learning--that the cash was the proceeds of drug trafficking. To the extent pertinent to this appeal, a jury found him guilty of conspiring to launder money, in violation of 18 U.S.C. § 1956(h) and 18 U.S.C. § 1957(a), and conspiring to travel in interstate and foreign commerce in aid of money laundering and drug trafficking, in violation of 18 U.S.C. § 371. We assume the parties' familiarity with the remaining facts and procedural history of this case, as well as the issues on appeal.

Datta challenges his conviction, the length of imprisonment to which he was sentenced, and the money judgment ordered by the district court. We will address each set of issues in turn.

First, Datta contends that the evidence presented at trial was insufficient to support his convictions. He argues that the government failed to demonstrate that he had the requisite intent or that he had any co-conspirators. His arguments are unpersuasive.

With respect to intent, the government produced sufficient evidence to support a reasonable jury's finding that Datta knew of the money laundering scheme and that his participation in cash transactions with at least one money exchanger–Faustino Garza-Gonzalez–

2

constituted steps to further the money laundering conspiracy. A reasonable jury could have relied on the following evidence, viewed in conjunction: (1) Datta was aware of money laundering schemes in general and knew that the Mexican cartels dealt in drugs; (2) Datta owned several stores and a warehouse on the border, and his business received millions of dollars of payments in cash delivered by foreign money exchangers from June 2009 to January 2011; (3) Datta's employees never asked for identification from money couriers; (4) Datta engaged in a $38,000 transaction with an undercover agent named Mario Recinos under the following circumstances: (a) Recinos told Datta that he was "looking to move [cash] a little faster" and that his associates were "down south," (b) Datta informed Recinos that he needed the passport of a Mexican national to report to the Internal Revenue Service ("IRS") so that no one could identify Recinos, and (c) Datta did not file a Form 8300 reporting the transaction to the IRS; (5) Datta continued to discuss with Recinos future deals to "wash[] the whole money" even after Recinos explicitly identified himself as a money launderer working with the Sinaloa cartel; (6) Datta told Recinos that "a lot of cash" was coming to him, that "[i]t's all Sinaloa money," and that he was "90 percent sure," of this, GX 107-T, at 32-33; (7) Datta signed and filed IRS Form 8300s that omitted the required identification of Garza-Gonzalez's money exchange or its employees and instead mentioned only the perfume merchants on whose behalf Garza-Gonzalez delivered the cash.

The evidence regarding the conspiracy to engage in interstate or foreign travel or use of interstate or foreign mail or wire facilities to further drug trafficking included testimony and exhibits relating to Datta's dealings with Garza-Gonzalez and Garza-Gonzalez's employees who regularly traveled from Mexico to deliver cash to Datta's company in Texas. It also included testimony and exhibits relating to a Mexican national who traveled to New York to make

3

structured cash deposits into Datta's company's bank accounts. This evidence was sufficient to support Datta's conviction.

The government also produced evidence sufficient to support findings that Datta conspired with Faustino Garza-Gonzalez, Garza-Gonzalez's employee Hilario Martinez-Garcia, and Datta's employees Yolanda Carillo and Cynthia Garza-Garcia. With respect to Garza-Gonzalez and Martinez-Garcia, the evidence showed that the cash was delivered to Garza-Gonzalez under highly suspicious circumstances and that Garza-Gonzalez told Martinez-Garcia that the cash was "narco dollars." The evidence also established that Datta omitted mention of Garza-Gonzalez, Martinez-Garcia, or their money exchange business on the IRS Form 8300s and that Martinez-Garcia omitted mention of Garza-Gonzalez or the money exchange business on the customs forms that he completed at the border. With respect to Cynthia Garza-Garcia, the evidence demonstrated that she was responsible for dealing with the money couriers and that she coordinated millions of dollars of cash payments with the money exchangers (also known as peso brokers). The government produced a recording of a telephone conversation in which Garza-Garcia told a peso broker that she never asked for identification from the money couriers. With respect to Yolanda Carillo, the evidence demonstrated that Carillo worked at Datta's warehouse and accepted cash deliveries there. The evidence also showed that Carillo filled out the Form 8300s for Datta's business and that she did so incorrectly, omitting any mention of Martinez-Garcia or Garza-Gonzalez or their money exchange business.

Second, Datta contends that the district court improperly excluded testimony when it did not allow either Martinez-Garcia or Garza-Gonzalez to testify about how they would have responded if anyone at Datta's business had asked about the source of the cash. Any error was harmless because the district court admitted other testimony indicating that Garza-Gonzalez and

4

Martinez-Garcia would not have told Datta about the source of the cash. Any error was also harmless because the evidence against Datta was strong, such that there is a "fair assurance . . . that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

Third, Datta contends that the district court improperly admitted the transcript of an allegedly prejudicial telephone conversation that took place on September 17, 2010, between Datta and a customer named Polo. During the conversation, Datta discussed efforts to collect a debt by sending agents to take goods from the store of a customer who owed him money. He also used vulgarity and made a remark about killing the delinquent customer. Assuming that the admission of the transcript was an abuse of discretion, it was nonetheless harmless error. The government's case against Datta was extremely strong and included evidence with respect to his participation in the money laundering scheme that was significantly more persuasive than the evidence that Datta challenges here. While the government mentioned the transcript in its closing remarks to the jury, the transcript was listed among a litany of other exhibits demonstrating Datta's guilt. The case was not close. *See United States v. Jean-Baptiste*, 166 F.3d 102, 108-09 (2d Cir. 1999) (holding that in determining whether an error is harmless, "we consider principally whether the government's case against the defendant was strong; whether the evidence in question bears on an issue that is plainly critical to the jury's decision . . .; whether the evidence was emphasized in the government's presentation of its case and in its arguments to the jury; and whether the case was close." (internal quotation marks and citations omitted)). Consequently, "it is highly probable that the error did not contribute to the verdict." *United States v. Stevens*, 211 F.3d 1, 5 (2d Cir. 2000) (internal quotation marks omitted).

5

Fourth, Datta challenges his conviction on the ground that he was deprived of his right to present a defense when the district court informed two potential witnesses for the defense, each of whom was an unindicted co-conspirator, that "taking the witness stand sometimes has personal implications for people, legal implications," and that "[i]t seems to me that it would be useful for each of you to have those rights explained to you by a qualified attorney before you make any decision about what you wish to do about testifying." App'x 177-78. Datta fails to acknowledge that "a district court certainly has the discretion to ensure that a witness in danger of unwittingly incriminating himself is aware of his constitutional privilege" so long as the court "does not abuse that discretion by intimidating a witness into silence." *United States v. Valdez*, 16 F.3d 1324, 1331 (2d Cir. 1994). In other words, the district court's statements to the witness "must be carefully tailored to ensure that warnings do not become threats." *Id.* Here, the district court's comments were appropriately tailored, and nothing about them was even remotely threatening.

Fifth, Datta contends that the district court abused its discretion by denying his motion for a transfer of venue to the United States District Court for the Southern District of Texas. Datta principally argues that the district court should have heavily weighted Datta's concern that New York jurors would not understand the cash-based nature of cross-border commerce in Texas. Datta has not shown, however, that New York jurors would be prejudiced against him; instead, he simply contends that they are ignorant of facts at issue in the case. The district court did not abuse its discretion in determining that a jury pool's lack of initial familiarity with the surrounding circumstances does not necessitate a change of venue.

Sixth, Datta contends that his sentence of 235 months of imprisonment is procedurally unreasonable for two reasons. He argues that the district court erred in finding that he was "in

6

the business of laundering funds" for the purposes of Section 2S1.1 of the United States Sentencing Guidelines ("U.S.S.G."). He also argues that the district court clearly erred in finding that he laundered more than 7 million dollars.

With respect to Datta's first argument, Note 4 to U.S.S.G. Section 2S1.1 provides "a non-exhaustive list of factors that may indicate the defendant was in the business of laundering funds," including: (1) "[t]he defendant regularly engaged in laundering funds," (2) "[t]he defendant engaged in laundering funds during an extended period of time," (3) "[t]he defendant engaged in laundering funds from multiple sources," (4) "[t]he defendant generated a substantial amount of revenue in return for laundering funds," (5) the defendant had prior convictions for money laundering, and (6) the defendant made statements during an undercover investigation to the effect that he engaged in any of the above conduct. Datta principally challenges the district court's findings with respect to the fourth factor. He argues that he was primarily a perfume merchant, that he did not inflate the price of perfume sold to money launderers, and that he did not seek or accept offers of a percentage of the laundered money. He contends that consequently he did not generate much, if any, revenue in return for money laundering.

Although the money laundering scheme in which Datta was involved was not traditional, it was not clear error to find that he generated substantial revenue by accepting drug proceeds as payment for perfume. The revenues that Datta generated through the money laundering scheme were the revenues his business earned through perfume sales paid for with laundered money. Nothing in the language of the Guidelines ("in the business of laundering funds," U.S.S.G. § 2S1.1), the Note ("[t]he defendant generated a substantial amount of revenue in return for laundering funds," Note 4 to U.S.S.G 2S1.1), or the commentary to the amendment to the Guidelines ("defendants . . . who gain financially from engaging in such transactions," U.S.S.G.

7

app. C, amend. 634, C-736 (2003)) indicates that the relevant revenues are only those generated by price inflation or by taking a cut of the laundered money.

In any event, with respect to the fourth factor, as well as the third and the sixth, the record includes a recorded conversation in which Datta told Recinos of an incident in which a certain person had come to Datta and said, "[A] lot of cash needs to move. He came to me and said Vikram. Give me one check for fifty thousand. I said, but why? He says I'll give you $60,000 cash . . . I had just started. What the hell that's easy." GX 107-T, at 21. Datta added, "I did it one time. He came very quick, he gave me $60,000 and took a check for $50,000, he was gone. He came back second time . . . next time he came for hundred." *Id.* at 21-22. Datta then asked about "the maximum percentage" he could earn and told Recinos, "[W]hen you will tell me this is, Vikram, this is the maximum percentage, then I can start maneuvering. And if God permits, I will maneuver so much money, you will be retired, you will not know what to do." *Id.* at 22.

Datta also contends that the district court erred in finding that he had laundered more than $7 million. He asserts that the only money proven to be laundered was the $6.7 million filtered through Garza-Gonzalez's money exchange. He argues that the district court's findings with respect to the additional $300,000 were not supported by the record. The evidence admitted at trial, however, demonstrates that the district court did not clearly err. Datta's records showed that he accepted millions of dollars in cash payments from customers other than those who purchased through Garza-Gonzalez's money exchange. In a recorded conversation, Datta told undercover agent Recinos that "there is a lot of cash . . . coming to me" and that "[i]t's all Sinaloa money." App'x 62-63. In another recorded conversation, Cynthia Garza-Garcia repeatedly stated that, without exception, she never requested identification from money

8

couriers. Given all of this evidence, the district court did not clearly err in finding that the government had demonstrated by a preponderance of the evidence that Datta's business accepted laundered funds from money exchangers other than Garza-Gonzalez; that a large number of cash customers were paying Datta with laundered funds; and that the total amount that he laundered outside of his transactions with Garza-Gonzalez exceeded $300,000.

Seventh, Datta contends that his sentence was substantively unreasonable. He principally argues that the district court incorrectly balanced the sentencing factors. "At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it. To be sure, this review is deferential. As a result, we would not consider what weight we would ourselves have given a particular factor. Rather, we consider whether the factor, as explained by the district court, can bear the weight assigned to it under the totality of circumstances in the case." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) (citations omitted). Here, we find no error in the district court's balancing or the weight it assigned to each factor.

Finally, Datta challenges the money judgment against him of $29,505,265.[1] Datta contends that this judgment violated the Eighth Amendment's prohibition against excessive fines. He also contends that the money he was ordered to forfeit did not belong to him.

We begin with the constitutional challenge. "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."

---

[1] Datta mistakenly argues that he was ordered to forfeit $40 million. The amount ordered by the district court judge at the sentencing hearing was ambiguous. The district court subsequently clarified any ambiguity when it entered a written Amended Judgment in a Criminal Case ordering that Datta forfeit only $29,505,265.

*United States v. Bajakajian*, 524 U.S. 321, 334 (1998). This Circuit applies the following four factors in determining whether a forfeiture is grossly disproportional: "[1] the essence of the crime of the defendant and its relation to other criminal activity, [2] whether the defendant fit into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the defendant's conduct." *United States v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009) (alterations in original) (internal quotation marks and brackets omitted) (quoting *United States v. Collado*, 348 F.3d 323, 328 (2d Cir. 2003) (per curiam)).

Here, Datta was convicted of laundering drug proceeds, a serious crime that is inextricably linked to the crime of drug trafficking. He was convicted under a statute that was designed to criminalize precisely the activity in which he was engaged, to wit, money laundering conspiracy in violation of 18 U.S.C. § 1956; and his conduct facilitated drug trafficking and all its concomitant harms. Datta's property was subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it was "involved in a transaction or attempted transaction in violation of section 1956." Datta used his perfume business to conceal the fact that he was laundering the proceeds of drug transactions, and the district court did not err in viewing the business's cash receipts during the period in question as "property . . . involved in" Datta's conspiracy to violate § 1956. Those cash receipts, including the $7 million in drug money, totaled $29,505,265. Had Datta been subject to a fine instead of forfeiture, the fine for Count Two could have been twice that amount. *See* 18 U.S.C. §§ 1956(a)(1) and (h) (a person convicted of violating or conspiring to violate § 1956 may be "fine[d] . . . not more than $500,000 or <u>twice</u> the value of the property involved in the transaction, <u>whichever is greater</u>." (emphases added)). In light of the statutory scheme and the above factors, it is clear to use that the money judgment here did not violate the Eighth Amendment.

Next, we turn to Datta's contention that the money he was ordered to forfeit did not belong to him. He asserts that he purchased perfume on credit and paid his suppliers only after the perfume was purchased and paid for by his customers. He argues that for this reason, the money did not belong to him and instead belonged to his creditors. This argument is meritless. Datta's suppliers were his creditors, not the owners of the money paid to his business.

We have considered Datta's remaining arguments and find them to be without merit. For the reasons stated herein, the judgment of the district court is **AFFIRMED**.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK